1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                   FOR THE EASTERN DISTRICT OF CALIFORNIA

8    MOHAMMED ABEDI,

9              Petitioner,              No. CIV S-06-0375 RRB JFM P

10         vs.

11   M. SHEPPARD, Warden, et al.,

12             Respondents.            FINDINGS AND RECOMMENDATIONS

13   _____/

14             Petitioner is a state prisoner proceeding through counsel[1] with an application for a

15   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is serving a sentence of 25 years

16   to life in prison following his 1986 Tulare County conviction on charges of first degree murder

17   with personal use of a knife.  (Answer, Ex. A.)  Petitioner challenges the April 23, 2002 decision

18   of the California Board of Prison Terms (Board) to deny him a parole date at his initial parole

19   consideration hearing.  Petitioner contends that there was no evidence to support the Board's

20   decision, and that the denial was contrary to law.

21                              ANALYSIS

22   I.  Standards for a Writ of Habeas Corpus

23             Federal habeas corpus relief is not available for any claim decided on the merits in

24   state court proceedings unless the state court's adjudication of the claim:

25   _____

26        [1] Petitioner filed the instant action pro se, but counsel filed a traverse on petitioner's
     behalf.  (January 4, 2007 Traverse.)

                                         1

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, __ U.S. __, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

/////

II.  Petitioner's Claims

   The April 23, 2002 decision challenged herein was made at the initial parole consideration hearing.  (See Exhibit B to Answer to Petition for Writ of Habeas Corpus, filed December 12, 2006.)  In its decision, the Board concluded that petitioner was "not suitable for parole and would pose and unreasonable risk of danger to society [or] a threat to public safety if released from prison."  (Ex. B to Answer, at 71.)  The Board relied on petitioner's commitment offense, which it described as "carried out in an especially cruel and callous . . . and dispassionate manner."  (Id.)  "The victim was abused and defiled and mutilated, stabbing no less than 15 times."  (Id.)[2]  The Board noted that petitioner had no prior criminal history, except for a charge of arson, which was dismissed through trial.  (Id. at 72.)  "[T]here's no record of violent behavior since [petitioner] has been incarcerated."  (Id. at 74.)  Petitioner received some minor disciplinaries while incarcerated,[3] but the state court noted that over the 16 or more years petitioner has been incarcerated he has been what some persons call a "model prisoner."  (Pet., Ex. 7, at 9.)  Despite a supportive report by Dr. Giantonio, the Board expressed there were "some unanswered questions and concerns" and requested a new psychiatric report at the next parole hearing.  (Answer, Ex. B, at 73.)  Specifically, the Board found that petitioner

> needs to continue to come to terms with and understand the crime
> that was committed.  He also needs to be able to face, discuss,
> understand, and cope with stress in a non-destructive manner.
> Until progress is made, the prisoner continues to be unpredictable
> and a threat to others.

(Id. at 74.)  Petitioner "has not completed necessary programming, which is essential to his adjustment, and needs additional time to gain such programming."  (Id. at 76.)  The Board

/////

---

  [2]  The Board also noted that petitioner also attempted to set up an innocent person as the perpetrator.  (Id. at 72.)  For the record, petitioner denies both the murder and the framing of the other person.  (Traverse at 10.)

  [3]  On June 27, 1988, petitioner received a disciplinary for absence; and on May 2, 1991 and October 15, 1996, petitioner received disciplinaries for property.  (Id. at 73.)

1   recommended that petitioner remain disciplinary free, upgrade vocationally, and continue to

2   participate in self-help programs.  (Id.)

3         Petitioner claims that there was no evidence to support the Board's decision to

4   deny him a parole date and that the decision was contrary to applicable provisions of state and

5   federal law.

6         A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

7   some transgression of federal law binding on the state courts, see Middleton v. Cupp, 768 F.2d

8   1083, 1085 (9th Cir.1985), and is unavailable for alleged errors in the interpretation or

9   application of state law, see Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  For this reason,

10   petitioner's claims arising out of alleged violations of state law are not cognizable in this federal

11   habeas corpus action.

12         California's statutory scheme governing parole "creates in every inmate a

13   cognizable liberty interest in parole which is protected by the procedural safeguards of the Due

14   Process Clause."  Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); see also Sass v.

15   California Board of Prison Terms, 461 F.3d 1123, 1127-28 (9th Cir. 2006).  "'[T]he Supreme

16   Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process

17   with respect to this interest if the board's decision is not supported by "some evidence in the

18   record," or is "otherwise arbitrary."' "  Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008)

19   (quoting Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007) (in turn quoting Superintendent v.

20   Hill, 472 U.S. 445, 457 (1985)).

21         California law allows the Board to consider a myriad of factors
when weighing the decision of granting or denying parole. Parole

22   may be denied if the Board "determines that the gravity of the
current convicted offense or offenses, or the timing and gravity of

23   current or past convicted offense or offenses, is such that
consideration of the public safety requires a more lengthy period of

24   incarceration for [the] individual."  Cal.Penal Code § 3041(b).

25   Biggs, at 915.

26   /////

> The regulations governing the parole process provide six nonexclusive factors tending to show unsuitability for parole and nine nonexclusive factors tending to show suitability. The factors tending to show unsuitability are: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors; and (6) Institutional Behavior. 15 Cal.Code Regs. § 2402(c). In terms of the first factor, "Commitment Offense," the regulations explain that it tends to show unsuitability when "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. at § 2402(c)(1). The factors indicating suitability for parole are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for the Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for the Future; and (9) Institutional Behavior. 15 Cal.Code Regs. § 2402(d).

Irons, 505 F.3d at 851 n.4. "Even though these suitability and unsuitability factors are helpful in analyzing whether a prisoner should be granted parole, California courts have made clear that the 'findings that are necessary to deem a prisoner unsuitable for parole,' Irons, 505 F.3d at 850, are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety." Hayward, at 543 (state law citations omitted).

Petitioner claims that there was no evidence to support application of any of the unsuitability factors to him, that there was substantial evidence to support application of the suitability factors to him, and that the evidence showed he would pose very little danger to the community if released.

Petitioner was received in state prison following his June 17, 1986 conviction for first degree murder, with personal use of a knife. (Answer, Ex. A.) Petitioner was sentenced to an indeterminate term of twenty-five years to life in prison. (Id.) Petitioner's initial parole consideration hearing was held on April 23, 2002, at which time parole was denied for a period of three years. (Ex. B to Answer, at 74.) The Board's decision was petitioner's first denial of parole. (Id. at 1a.) Petitioner's minimum eligible parole date was March 6, 2003. (Pet., Ex. 3 at 1.) At the time of the 2002 parole hearing, petitioner was 61 years old. (Answer, Ex. C, at 1.)
/////

As noted above, the Board relied principally on petitioner's commitment offense to support the denial of parole.  The record reflects that there was some evidence before the Board to support the description of petitioner's commitment offense.  Petitioner claims that this factor alone is insufficient to support a finding of present dangerousness required to justify the denial of parole.  Specifically, petitioner contends that the few disciplinaries he has received have been minor and that his prison behavior record demonstrates he poses little threat to the community.

The record before the Board at the time of the 2002 hearing contains substantial evidence contrary to the Board's conclusion that petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  Petitioner had no prior juvenile or adult criminal record.  In the Psychological Evaluation prepared November 5, 2001, Dr. Giantonio found that petitioner posed a below average assessment of dangerousness both in the controlled setting of prison as well as if released on parole.  (Pet., Ex. 3.)  Dr. Giantonio supported that conclusion:

> In this case, factors indicating a lower risk of recidivism are his numerous years of disciplinary-free adjustment, his consistent and laudatory work at the various institutions in roles of key responsibility, his history of industry in application of his work skills, his strong family background in his formative years, his maintenance of strong family connections, the support of the Islamic community, and the supportive community he has made with friends argue on his behalf.  He is self-reflective, insightful, nondefensive, and open to ongoing personal growth and insight as he approaches new experiences.  His style of coping and problem-solving seems to be one of facing his problems and working out plans and strategies to work through those problems step-by-step, making the best of each situation.  Such a skill will serve him well should he have the opportunity to manage the stresses and obstacles presented by life situations in the parole setting.

(Pet., Ex. 3.)  Indeed, the Board noted that petitioner has an advanced degree in civil engineering and had a very stable social history.  (Answer, Ex. B, at 73.)  Petitioner "is a very bright individual.  He has a high GPL."  (Answer, Ex. B, at 74.)  In the Life Prisoner Evaluation report prepared in February of 2002, CCI D. Hickey found that:

> Considering the commitment offense, prior record and prison adjustment, this writer believes [petitioner] would pose a moderate degree of threat to the public if released from prison.  This opinion is based on [petitioner] could potentially be deported to Iran.  If not deported he will receive assistance from his three children in addition to possessing a general contractor's license.

(Pet., Ex. 4.)  Petitioner's three adult children support his release despite petitioner's conviction for killing their mother.  (Pet., Ex. 3 at 5; Answer, Ex. B, at 47-48.)

The 1996 report by B. Jarvis, Ph.D., Clinical Psychologist, noted that petitioner's "violence potential is considered to be low under most circumstances, as long as he continues to utilize his acquired coping techniques for stress."  (Traverse, Ex. 1, at 2.)  Although Dr. Jarvis noted an Axis II diagnosis of antisocial personality disorder, Dr. Jarvis noted it was improving, and stated that "[i]t is not believed that any mental disorder contributed either directly or indirectly to the instant offense."  (Id.)  Petitioner "has greatly matured while in prison and has made a sustained effort to improve himself and is likely to continue to program without incident."  (Id.)

The Board also noted that Dr. Falkenstein, M.D., reported that "[i]n a less controlled setting such as return to the community, [petitioner] is likely to continue improving.  Violence potential is considered to have been less than average and at present is estimated to be the same."  (Answer, Ex. B. at 36.)

Because petitioner holds an advanced degree in civil engineering, this court finds no support for the Board's finding that petitioner has failed to upgrade vocationally.  Petitioner "has subsequently taken various classes in the United States to comply with construction licensure requirements.  His TABE scores average at 12.9.  His cognition and level of articulation are consistent and reflective of his higher education and rearing in a privileged class."  (Pet., Ex. 3 at 1.)  Petitioner was self-employed as a general contractor prior to incarceration.  (Pet., Ex. 4 at 4.)

/////

The Board conceded that work had not been a problem for petitioner, noting multiple laudatory chronos in petitioner's file, including two from Associate Warden Cottier, who the Board noted "doesn't write too many chronos.  So you're to be commended for getting a laudatory chrono from Mr. Cottier."  (Answer, Ex. B, at 43-44; 45; 46-47.)  Petitioner received letters of appreciation for his volunteer work in the Muslim community at Donovan.  (Answer, Ex. B, at 45.)

The United States Court of Appeals for the Ninth Circuit has held that after an inmate has "served the minimum number of years required by his sentence," Irons, 505 F.3d at 853, extended reliance solely "an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs at 917.

Here, the 2002 hearing was petitioner's initial parole consideration hearing and was held prior to the expiration of his minimum eligible parole date of March 6, 2003.  Because petitioner is challenging a parole hearing that predated his minimum eligible parole date, his due process claim is barred under Irons.  In Irons the Ninth Circuit sought to harmonize the holdings in Biggs and Sass, stating as follows:

> Because the murder Sass committed was less callous and cruel[4] than the one committed by Irons,[5] and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in Sass precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief.
>
> We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number

[4] Sass was convicted of second degree murder, gross vehicular manslaughter, hit and run death, causing injury while driving under the influence, and felony drunk driving.

[5] Irons was convicted of second degree murder in the death of his former housemate.

1
2
3
4

    of years to which they had been sentenced at the time of the
challenged parole denial by the Board. <u>Biggs</u>, 334 F.3d at 912;
<u>Sass</u>, 461 F.3d 1125. All we held in those cases and all we hold
today, therefore, is that, given the particular circumstances of the
offenses in these cases, due process was not violated when these
prisoners were deemed unsuitable for parole prior to the expiration
of their minimum terms.

5
6
7
8
9
10

    Furthermore, we note that in <u>Sass</u> and in the case before us there
was substantial evidence in the record demonstrating rehabilitation.
In both cases, the California Board of Prison Terms appeared to
give little or no weight to this evidence in reaching its conclusion
that Sass and Irons presently constituted a danger to society and
thus were unsuitable for parole. We hope that the Board will come
to recognize that in some cases, indefinite detention based solely
on an inmate's commitment offense, regardless of the extent of his
rehabilitation, will at some point violate due process, given the
liberty interest in parole that flows from the relevant California
statutes. <u>Biggs</u>, 334 F.3d at 917.

11   <u>Irons</u>, 505 F.3d at 853-54.  Petitioner's crime[6] is more comparable to the crime committed in

12 <u>Irons</u>, as opposed to the crime committed in <u>Sass</u>, with the exception that petitioner was found

13 guilty of first degree murder and Irons was convicted of second degree murder.  <u>Irons</u>, unlike

14 petitioner, was denied parole on five separate occasions.  Irons' prison record was only slightly

15 better than petitioner's in that Irons had not received any disciplinary charges during his sixteen-

16 year incarceration.  Because petitioner's criminal offense is more like <u>Irons</u>, and petitioner had

17 not yet served his minimum sentence at the time of his 2002 parole hearing, this court cannot

18 find that petitioner's due process rights were violated by the 2002 denial of parole.

19         Petitioner argues the disciplinaries he has sustained are minor and the most recent

20 one occurred six years prior to the hearing.  Most petitioners winning challenges to parole denials

21

22
23
24
25
26

    [6]  The Board described petitioner's crime as follows: "On June 7, 1980, Esmat Abedi, . . .
was stabbed to death while she was in the master bedroom of her Visalia . . . home.  Esmat was
the wife of [petitioner].  Visalia Police initially arrested Omar . . . Selitey . . ., a student residing
with the Abedi, as a suspect.  [¶]  Officers found the victim's blood on Selitey's body and
clothing and found a knife in his room.  The police eventually concluded [petitioner] framed
Selitey, and killed his wife out of jealousy, fear of losing community property, and the need to
obtain . . . $60,000 in mortgage insurance proceeds.  The Superior Court dismissed Selitey's
criminal case and [petitioner] was charged and ultimately convicted in a second trial." (Pet., Ex.
1, at 10; Answer, Ex. B, at 10.)

1   have sustained no prison disciplinaries or have not sustained a prison disciplinary for many years.

2   For example, Mr. Hayward had "not had a major disciplinary violation in prison since 1989, and

3   his last minor disciplinary infraction was in 1997." Hayward v. Marshall, 512 F.3d at 538; see

4   also Madrid v. Mendoz-Powers, 2008 WL 724066 at *7 (E.D. Cal. March 17, 2008)("[Madrid]

5   has been a model inmate, having committed not a single disciplinary infraction.")  Petitioner's

6   arguments that his disciplinary record is minor are well-taken.  So long as petitioner remains

7   disciplinary-free, his last disciplinary, incurred October 15, 1996 for a property violation, should

8   not pose a parole suitability problem.

9          The 2002 decision to deny petitioner parole was the first denial of parole premised

10  almost entirely on petitioner's commitment offense.  The record does not demonstrate that at the

11  time of the 2002 decision the Board had relied for an extended period of time solely on this

12  unchanging factor.  The Ninth Circuit has not specified the number of denials or the length of

13  time served beyond the minimum sentence that would constitute a due process violation.[7]

14  Moreover, while there was certainly evidence in the record that might have supported a different

15  decision by the Board, the  Board's determination that the positive evidence did not outweigh the

16  gravity of petitioner's commitment offense did not, on the facts of this case, violate petitioner's

17  right to due process.  However, now that petitioner has served beyond his minimum eligible

18  parole date of 2003, should the Board continue to deny parole based on the commitment offense

19  without some evidence that petitioner poses a present risk of dangerousness to the community,

20  petitioner may well be entitled to relief under Hayward. Id., 512 F.3d at 543.

21          In accordance with the above , IT IS HEREBY RECOMMENDED that

22  petitioner's application for a writ of habeas corpus be denied.

23

24         [7] In another case, a court of this district granted a habeas petition, finding a due process
    violation in the denial of parole at the petitioner's twelfth parole suitability hearing after he had
    served twenty-four years of a sentence of life with the possibility of parole for first degree murder
25  where all factors indicated suitability for parole.  See Johnson v. Finn, 2006 WL 195159, *12
    (E.D.Cal.2006); appeal argued and submitted, No. 06-17042 (9th Cir. September 24, 2007).  In
26  Johnson, the Board had granted a parole date, but the Governor reversed that decision.

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

3  after being served with these findings and recommendations, any party may file written

4  objections with the court and serve a copy on all parties.  Such a document should be captioned

5  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

6  failure to file objections within the specified time may waive the right to appeal the District

7  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8  DATED:  April 2, 2008.

9

10                        UNITED STATES MAGISTRATE JUDGE

11

12  /001; abed0375.157

13

14

15

16

17

18

19

20

21

22

23

24

25

26